1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8                  EASTERN DISTRICT OF CALIFORNIA

9

10   CROSS CULTURE CHRISTIAN            No.  2:20-cv-00832-JAM-CKD
     CENTER, a California Non-
11   Profit Corporation; PASTOR
     JONATHAN DUNCAN, an
12   individual,                        **ORDER DENYING EX PARTE**
                                        **APPLICATION FOR TEMPORARY**
13              Plaintiffs,             **RESTRAINING ORDER**

14        v.

15   GAVIN NEWSOM, in his official
     capacity as Governor of
16   California; XAVIER BECERRA,
     in his official capacity as
17   the Attorney General of
     California; SONIA ANGELL, in
18   her capacity as California
     Public Health Officer; MAGGIE
19   PARK, in her official
     capacity as Public Health
20   Officer, San Joaquin County;
     MARCIA CUNNINGHAM, in her
21   official capacity as Director
     of Emergency Services, San
22   Joaquin County; CITY OF LODI;
     TOD PATTERSON, in his
23   official capacity as Chief of
     Police of Lodi, California,
24
                Defendants.
25

26

27        Cross Culture Christian Center ("Cross Culture Christian" or

28   the "Church") and its pastor, Jonathan Duncan, filed a ten-count

                                    1

1  complaint against the City of Lodi, its police chief, and several

2  State and County officials.  Compl., ECF No. 1.  They allege the

3  stay-at-home orders Governor Newsom and San Joaquin County

4  enacted to slow the spread of COVID-19 ("State Order" and "County

5  Order") impermissibly infringe upon their constitutional and

6  statutory rights to speak, assemble, and practice religion as

7  they choose.  Plaintiffs then filed an ex parte application for a

8  temporary restraining order.  Ex parte Application for TRO

9  ("TRO"), ECF No. 4.  They request the Court enjoin enforcement of

10  the State and County orders against Cross Culture Christian so

11  long as the church complies with the CDC's social distancing

12  guidelines while conducting its in-person services.[1]  TRO at 2.

13  The State Defendants opposed Plaintiffs' motion.  Opp'n by Sonia

14  Angell, Xavier Becerra, Gavin Newsom ("State Opp'n), ECF No. 15.

15  The County and City Defendants filed a joint opposition.  Opp'n

16  by City of Lodi, et al. ("Local Opp'n").  The Court also granted

17  leave for Americans United for the Separation of Church and State

18  to file a brief as amicus curiae in support of Defendants.  ECF

19  No. 18.  Plaintiffs then filed a reply.  ECF No. 21.

20      For the reasons set forth below, the Court DENIES

21  Plaintiffs' request for a temporary restraining order.

22                      I.  FACTUAL BACKGROUND

23      Cross Culture Christian is a church in Lodi, California led

24  by Pastor Duncan.  Compl. ¶¶ 17, 18.  Cross Culture Christian

25  used to hold Wednesday and Sunday services in the sanctuary of a

26  building it rented from Bethel Open Bible Church.  Compl. ¶ 56.

27  ────────────────

28  [1] Plaintiffs' ex parte application was determined to be suitable
   for decision without oral argument.  E.D. Cal. L.R. 230(g).

2

1   But in March 2019, Governor Newsom and San Joaquin County began
2   issuing stay at home orders to combat the rapid spread of COVID-
3   19.  Compl. ¶¶ 31, 36.  The Lodi Police Department, enforcing
4   these orders, eventually required the Church to stop holding in-
5   person services.  Compl. ¶ 75.

6       In early March, Governor Newsom enacted Executive Order N-
7   33-20, a statewide "stay at home order."  Compl. ¶ 31.  The order
8   directed California residents to "stay home or at their place of
9   residence except as needed to maintain continuity of operations
10  of the federal critical infrastructure services."  Compl. ¶ 32;
11  Ex. A to Compl., ECF No. 1-1.  Governor Newsom reserved authority
12  to "designate additional sectors as critical [to] protect the
13  health and well-being of all Californians."  Id.  On March 21,
14  San Joaquin County followed suit.  Compl. ¶ 36.  It issued a stay
15  at home order directing "all businesses and governmental agencies
16  to cease non-essential operations at physical locations in the
17  county" and prohibiting "all non-essential gatherings of any
18  number of individuals."  Ex. 2 to Compl., ECF No. 1-2.  The
19  County order also incorporated Executive Order N-33-20 by
20  reference.  Id. at 1.

21      As COVID-19 continued to spread, Governor Newsom and County
22  officials issued amendments containing increasingly stringent
23  restrictions.  Compl. ¶¶ 31-46.  California's March 22 order set
24  forth with more specificity its list of "Essential Critical
25  Infrastructure Workers."  Compl. ¶ 33; Ex. 6 to Compl., ECF No.
26  1-6.  The amendment designates "[f]aith based services that are
27  provided through streaming or other technology" as an essential
28  part of the "Other Community-Based Government Operations and

                                    3

1    Essential Functions" sector.  Ex. 6 to Compl. at 11.   The list

2    otherwise makes no mention of faith, churches, religion,

3    religious workers, Christianity, worship, or prayer.  The

4    County's March 26 order removed an exemption in the earlier order

5    that allowed six or fewer nonrelatives to meet at someone's home

6    or place of residence.  Ex. 3 to Compl., ECF No. 1-3.  Cross

7    Culture Christian nevertheless continued to hold in-person

8    services throughout the month of March. Compl. ¶¶ 63-65.

9        In response to the Church's continued operation, three Lodi

10   police officers posted a notice on the building, explaining that

11   its non-essential use of the facility was a public nuisance.

12   Compl. ¶ 73.  Two days later, on April 3, a County Public Health

13   Officer issued an Order Prohibiting Public Assembly to the

14   Church's lessor, Bethel Open Bible Church.  Compl. ¶ 43; Ex. 4 to

15   Compl., ECF No. 1-4.  The order stated that allowing a tenant to

16   hold in-person services violated the State and County stay at

17   home orders.  The order concluded, "[a]ny person who refuses or

18   willfully neglects to comply with this emergency order is guilty

19   of a misdemeanor, punishable by fine and/or imprisonment."  Id.

20   Bethel Open Bible Church could, however, continue to operate its

21   child-care facility "consistent with the order of the State

22   Public Health Officer."  Id.

23       The following Sunday, Duncan returned to Cross Culture

24   Christian.  His landlord had changed the locks.  Compl. ¶ 75.

25   Lodi law enforcement barred access to the property under threat

26   of citation. Compl.  Id.

27   ///

28   ///

1                               II.   OPINION

2         A.   Judicial Notice

3         District courts may take judicial notice of "a fact that is

4   not subject to reasonable dispute because it: (1) is generally

5   known within the trial court's territorial jurisdiction; or (2)

6   can be accurately and readily determined from sources whose

7   accuracy cannot reasonably be questioned."  Fed. R. Evid.

8   201(b). To this end, a court may take judicial notice "of court

9   filings and other matters of public record," Reyn's Pasta

10  Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 n.6 (9th Cir.

11  2006), including "government documents available from reliable

12  sources on the internet," California River Watch v. City of

13  Vacaville, No. 2:17-cv-00524-KJM-KJN, 2017 WL 3840265, at *2 n.1

14  (E.D. Cal. Sept. 1, 2017).

15        The State Defendants request the Court take judicial notice

16  of various filings, rulings, and hearing transcripts related to

17  motions for temporary restraining orders in the following cases:

18  Gish v. Newsom, No. 5:20-cv-00755-JGB-KK (C.D. Cal.); Abiding

19  Place Ministries v. Wooten, No. 3:20-cv-00683-BAS-AHG (S.D.

20  Cal.); Nigen v. New York, No. 1:20-cv-01567-EK-PK (E.D.N.Y.);

21  Tolle v. Northam, No. 1:20-cv-00363-LMB-MSN (E.D. Va.); Binford

22  v. Sununu, NO. 217-2020-cv-00152 (N.H. Sup. Ct.); On Fire

23  Christian Ctr., Inc. v. Fischer, No. 3:20-cv-264-JRW (W.D. Ky.);

24  Temple Baptist Church v. City of Greenville, No. 4:20-cv-00064-

25  DMB-JMV (N.D. Miss.).  Grabarsky Decl. to State Opp'n ¶¶ 8-14,

26  ECF No. 15-1.  The City and County Defendants ("Local

27  Defendants") request judicial notice of the following documents

28  issued by the state and federal government:

                                  5

- State of California's Proclamation of a Statewide Emergency, from the Executive Department, State of California, signed by Governor Gavin Newsom on March 4, 2020;
- State of California Department – Health and Human Services Agency, California Department of Public Health, Public Guidance for the Prevention of COVID-19 Transmission for Gatherings, dated March 16, 2020;
- Executive Order N-33-20, from the Executive Department of the State of California, signed by Governor Gavin Newsom on March 19, 2020;
- U.S. Department of Homeland Security Advisory Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response, from Director Christopher C. Krebs, dated March 28, 2020; and
- State of California Public Health Officer Designation of Essential Critical Infrastructure Workers, dated April 28, 2020.

Local Defendants' Request for Judicial Notice, ECF No. 17.

The court filings and government documents Defendants reference are all proper subjects of judicial notice.  The Court therefore GRANTS Defendants' requests.  In doing so, the Court judicially notices "the contents of the documents, not the truth of those contents." Gish v. Newsom, No. EDCV 20-755-JGB(KKx), at *2 (C.D. Cal. April 23, 2020).

   B.   Legal Standard

A party seeking a temporary restraining order must establish (1) he is likely to succeed on the merits; (2) he is

6

likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest.  <u>Winter v. Nat. Res. Def. Council,</u> <u>Inc.</u>, 555 U.S. 7, 20 (2008); <u>see also</u> <u>Stuhlbarg Intern Sales</u> <u>Co., Inc. v. John D. Brush and Co., Inc.</u>, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  In the Ninth Circuit, courts may also issue temporary restraining orders when there are "serious questions going to the merits" and a "balance of hardships that tips sharply towards the plaintiff" so long as the remaining two <u>Winter</u> factors are present.  <u>Alliance for Wild Rockies v.</u> <u>Cottrell</u>, 632 F.3d 1127, 1135 (9th Cir. 2011).  When applying either test, courts operate with the understanding that a temporary restraining order, much like a preliminary injunction, is an "extraordinary and drastic remedy."  <u>Cf.</u> <u>Munaf v. Geren</u>, 553 U.S. 674, 690 (2008).  "The propriety of a temporary restraining order, in particular, hinges on a significant threat of irreparable injury [] that must be imminent in nature." <u>Gish</u>, No. EDCV 20-755-JGB(KKx), 2020 WL 1979970, at *3 (April 23, 2020) (citing <u>Simula, Inc. v. Autoliv, Inc.</u>, 175 F.3d. 716, 725 (9th Cir. 1999); <u>Caribbean Marine Serv. Co. v. Baldridge</u>, 844 F.2d 668, 674 (9th Cir. 1988)).

   C.   <u>Analysis</u>

   Plaintiffs request the Court enjoin Defendants from enforcing the State and County stay at home orders against the Church's biweekly in-person services.  TRO at 1-2.  Plaintiffs contend they satisfy each of the four conventional <u>Winter</u> factors.  If allowed to resume in-person services, Plaintiffs maintain they would "follow CDC guidelines and San Joaquin

County social distancing protocols in the use of their sanctuary for assemblies and their parking lot for drive-in services" and would "keep their assemblies under 50 persons until the dangers posed by COVID-19 pass."  TRO at 22.[2]

But as Defendants argue, Plaintiffs cannot show they are likely to succeed on the merits of the two claims referenced in their motion for temporary restraining order.  See TRO at 6-18. As an initial matter, both stay at home orders flow from valid exercises of state and local emergency police powers.  Moreover, Plaintiffs are unlikely to show the orders violate the Free Exercise Clause or even implicate RLUIPA's protections.  For the same reasons, Plaintiffs also fail to raise serious questions going to the merits of these two claims.  As a result, the Ninth Circuit's "serious question" analysis does not provide them an alternative avenue for preliminary relief.

    1.   Likelihood of Success on the Merits / Serious Questions going to the Merits

    a.  Emergency Powers

Over a hundred years ago, the Supreme Court upheld a state's exercise of its general police powers to promote public safety during a public health crisis.  Jacobson, 197 U.S. 11, 25

---

[2] After Plaintiffs filed this suit, the State and County both clarified that drive-in services are permitted under the stay at home orders provided congregants "refrain from direct or indirect physical contact" and "do not leave their cars."  See State Opp'n at 4; Ex. 13 to Grabarsky Decl.; County Opp'n at 5; Ex. N to Park Decl., ECF No. 17-1. The Court denies as moot the portion of Plaintiffs' motion that seeks to temporarily enjoin either order's prohibition of drive-in services.  See Bd. Of Trustees of Glazing Health and Welfare Trust v. Chambers, 941 F.3d 1195, 1199 (9th Cir. 2019).

(1905).  A state's police power entails the authority "to enact quarantine laws and 'health laws of every description'"—even under normal circumstances.  Id.  States may invest this authority to counties and cities within their province.  Id. Under normal circumstances, however, state and local regulations enacted pursuant to a general police power must, "always yield in case of conflict" to both the Constitution and permissible exercises of federal authority.  Id.

But sometimes, normalcy is lost.  When that occurs, "[t]he authority to determine for all what ought to be done in [] an emergency must [be] lodged somewhere or in some body."  Id. at 27.  It is not "unusual nor [] unreasonable or arbitrary" to invest that authority in the state, for "[a] community has the right to protect itself against an epidemic of disease which threatens the safety of its members."  Id.  In view of this principle, when a state or locality exercises emergency police powers to enact an emergency public health measure, courts will uphold it unless (1) there is no real or substantial relation to public health, or (2) the measures are "beyond all question" a "plain, palpable invasion of rights secured by [] fundamental law."  Id. at 30.[3]

---

[3] Even with a hundred years of hindsight, courts continue to adopt Jacobson's benchmark when reviewing emergency public health measures enacted pursuant to emergency police powers.  See, e.g., Gish, 2020 WL 1979970, at *5 (citing Jacobson, 197 U.S. at 31); Robinson v. Attorney General, No. 20-11401-B, WL 1952370, at *8 (11th Cir. April 23, 2020) (same); In re Abbott, No. 20-50296, 2020 WL 1911216, at *16 (5th Cir. 2020); Legacy Church, Inc. v. Kunkel, No. CIV 20-0327 JB/SCY, 2020 WL 1905586, at *40 (D. N.M. April 17, 2020) (same); Hickox v. Christie, 205 F.Supp.3d 579, 591-93 (D. N.J. 2016) (same).

1    This Court finds the State and County stay at home orders

2    being challenged here bear a real and substantial relation to

3    public health.  Arguing otherwise, Plaintiffs contend Cross

4    Culture Christian's biweekly services "do not pose a unique or

5    unacceptable threat to public health and safety"—"[i]n fact, the

6    Church . . . is much safer than shopping at Costco, Walmart, or

7    Home Depot in Lodi."  TRO at 20.  This argument is unpersuasive

8    for the following reasons.  First, it assumes that the State and

9    County's designation of essential activities turns solely upon

10   people's ability to comply with the CDC guidelines while engaged

11   in those activities.  Not so.  The State's order expressly

12   states it took other considerations into account, i.e.,

13   continuing non-COVID-19 emergency services, providing clean

14   water, protecting the state's supply chains, etc.  See Ex. 6 to

15   Compl.

16   Second, Plaintiffs' argument ignores Jacobson's mandate

17   that, during public health crises, "it is no part of the

18   function of a court... to determine which of two modes was

19   likely to be the most effective for the protection of the public

20   against disease."  Jacobson, 197 U.S. at 30; see also In re

21   Abbott, 954 F.3d at 777.  Starting in December 2019, "California

22   began working closely with the national Centers for Disease

23   Control and Prevention, the United States Health and Human

24   Services Agency, and local health departments to monitor and

25   plan for the potential spread of COVID-19."  State Opp'n at 3

26   (citing Grabarsky Decl).  The State and County orders flow from

27   the information those experts provided.  Id. at 3-4.  To

28   successfully argue the State and County orders do not reflect

10

1  reasoned responses to the COVID-19 pandemic, plaintiffs must do

2  more than contend they would have done things differently.

3  Jacobson, 197 U.S. 30.  Plaintiffs here did not carry that

4  burden.

5        Finally, Plaintiffs failed to produce any evidence that

6  their in-person gatherings pose little threat of increasing

7  COVID-19's spread.  "Because asymptomatic and pre-symptomatic

8  carriers of the virus can infect others," Plaintiffs' belief

9  that the Church's congregants "have never had or contracted []

10 coronavirus . . . never been at any time exposed to the danger

11 of contracting it, and [] never been in any locality where []

12 coronavirus . . . has [] existed," is "largely meaningless."

13 Gish, 2020 WL 1979970, at *4.  Indeed, the known reality of how

14 unknown carriers transmit this highly-infectious disease further

15 belies Plaintiffs' argument.  See State Opp'n at 9; Brief of

16 Amicus Curiae Americans United for Separation of Church and

17 State at 17-18 ("Americans United Amicus"), ECF No. 9-1; see

18 also Hilda Flores, One-third of COVID-19 cases in Sac County

19 tied to church gatherings, officials say, KCRA (Apr. 1, 2020,

20 2:55 PM)[4]; Tony Bizjak, et al., 71 infected with coronavirus at

21 Sacramento church. Congregation tells county 'leave us alone',

22 SACRAMENTO BEE (Apr. 2, 2020)[5]; Richard Read, A choir decided to go

23 ahead with rehearsal; Now dozens of members have COVID-19 and

24 two are dead, L.A. TIMES (March 29, 2020)[6]; Bailey Loosmore &

25 ───────────────────

   [4] Available at https://www.kcra.com/article/sacramento-county-
26 one-third-of-covid-19-cases-tied-church-gatherings-officials-
   say/32011107#.
27 [5] Available at
   https://www.sacbee.com/news/coronavirus/article241715346.html.
28 [6] Available at https://www.latimes.com/world-nation/story/2020-

                                11

1   Mandy McLaren, <u>Kentucky county 'hit really, really hard' by</u>

2   <u>church revival that spread deadly COVID-19</u>, LOUISVILLE COURIER

3   JOURNAL (updated Apr. 2, 2020)[7].  Plaintiffs claim their in-person

4   gatherings pose no greater threat to life than the activities

5   the State and County orders permit.  TRO at 20.  But as the

6   Central District of California recently explained: even if

7   holding in-person services is just as safe as keeping grocery

8   stores open, people will die.  <u>Gish</u>, 2020 WL 1979970, at *6

9   (citing Dalvin Brown, <u>COVID-19 Claims Lives of 30 Grocery Store</u>

10  <u>Workers, Thousands More May Have It, Union Says</u>, USA TODAY, (last

11  accessed April 23, 2020))[8].

12      Even in times of health, government officials must often

13  strike the delicate balance between ensuring public safety and

14  preserving the Constitution's fundamental guarantees.  The

15  judiciary plays an important role in ensuring that balance is

16  permissibly struck.  But during public health crises, new

17  considerations come to bear, and government officials must ask

18  whether even fundamental rights must give way to a deeper need

19  to control the spread of infectious disease and protect the

20  lives of society's most vulnerable.  Under these rare

21  conditions, the judiciary must afford more deference to

22  officials' informed efforts to advance public health—even when

23  those measures encroach on otherwise protected conduct; even

24  _____

25  03-29/coronavirus-choir-outbreak.
    [7] Available at https://www.courier-

26  journal.com/story/news/2020/04/01/coronavirus-kentucky-church-
    revival-leads-28-cases-2-deaths/5108111002/

27  [8] Available at
    https://www.usatoday.com/story/money/2020/04/14/coronavirus-

28  claims-lives-30-grocery-store-workers-union-says/2987754001/.

1    when thoughtful minds could disagree about how to best balance
2    the scales.  See Jacobson, 197 U.S. at 28-32, 34-38; Gish, 2020
3    WL 1979970, at *4-5.

4         The State and County bans on mass gatherings such as
5    sporting events, concerts, dining rooms, and in-person church
6    services flow from a larger goal of substantially reducing in-
7    person interactions.  See State Opp'n at 14.  Plaintiffs fail to
8    show this goal, and the means used to achieve it, do not bear a
9    "real and substantial relationship" to preventing widespread
10   transmission of COVID-19.  See Jacobson, 197 U.S. at 30.
11   Moreover, as explained below, Plaintiffs do not show the orders
12   are "beyond all question" a "plain, palpable invasion of rights
13   secured by [] fundamental law."  Id. at 30.  The Court finds
14   Plaintiffs are not likely to succeed on the merits of their
15   challenge to the State and County stay at home orders as
16   impermissible exercises of emergency police powers.

17                  b.   Free Exercise Clause
18        The First Amendment, as incorporated against states through
19   the Fourteenth Amendment, protects the "free exercise" of
20   religion.  U.S. CONST. Amend. 1; Cantwell v. State of
21   Connecticut, 310 U.S. 296, 303 (1940).  The Free Exercise Clause
22   guards individuals from state interference when exercising
23   sincerely-held religious beliefs.  Church of the Lukumi Babalu
24   Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993).
25   "[R]eligious beliefs need not be acceptable logical, consistent,
26   or comprehensible to others in order to merit First Amendment
27   protection."  Id. (quoting Thomas v. Review Bd. of Indiana
28   Employ. Sec. Div., 450 U.S. 707, 714 (1981).  Laws and

                                  13

1  ordinances that "single[] out" a religious practice for

2  discriminatory treatment "must undergo the most rigorous of

3  scrutiny." Id. at 538, 546.

4      But the understandably cherished freedom to exercise

5  sincerely-held religious beliefs "does not relieve an individual

6  of the obligation to comply with a valid and neutral law of

7  general applicability." County Opp'n at 10 (quoting Stormans,

8  Inc. v. Wiesman, 794 F.3d 1064, 1075-76 (9th Cir. 2015); State

9  Opp'n at 13 (same). More specifically, when a neutral law of

10  general application places incidental limits on a religious

11  exercise, "the right to practice religion freely does not

12  include liberty to expose the community . . . to communicable

13  disease." Legacy Church, 2020 WL 1905586, at *30 (quoting

14  Prince v. Massachusetts, 321 U.S. 158, 166-67 (1944)). Courts

15  look to both the text and the effect of a law to determine

16  whether it is neutral and generally applicable. Parents for

17  Privacy v. Barr, 949 F.3d 1210, 1234 (9th Cir. 2020).

18      The Court first finds that the State and County orders are

19  neutral. [T]he minimum requirement of neutrality is that a law

20  not discriminate on its face." Church of Lukumi, 508 U.S. at

21  533. Plaintiffs contend the State and County orders facially

22  discriminate against religious gatherings because they "prohibit

23  all 'faith based' assemblies even if they strictly follow CDC

24  and social distancing guidelines." TRO at 8. To be clear, the

25  State and County orders direct all residents to stay home

26  "except as needed to maintain continuity of operations" for

27  state- and locally-designated sectors. Exs. 5-6 to Compl. The

28  orders then dub "[f]aith based services that are provided

14

1   through streaming or other technology" as essential.  Id.  They

2   do not, however, include in-person religious assemblies in their

3   list of exemptions.  Now properly situated, the Court does not

4   find this qualifies as facially discriminatory text.  "Facial

5   neutrality does not require freedom from any mention of

6   religion." Gish, 2020 WL 1979970, at *6.  Rather it prohibits

7   laws from targeting "religious practice[s], conduct, belief[s],

8   or motivation[s]."  Stormans, 794 F.3d at 1076.  The face of the

9   orders prohibit all non-essential gatherings.  Exs. 5-6 to

10  Compl.  The exempted categories of "essential" conduct include

11  religious and secular activities; as do the non-exempted

12  categories.  Exs. 1, 5-6 to Compl.  Looking only to the text of

13  the orders, the Court does not find that the orders' exemptions

14  discriminate on the basis of religion.

15      Admittedly, "[f]acial neutrality is not determinative"; the

16  Free Exercise Clause also "forbids subtle departures from

17  neutrality."  Masterpiece Cakeshop v. Colorado Civil Rights

18  Commission, 138 S. Ct. 1719, 1731 (2018) (quoting Church of

19  Lukumi, 508 U.S. at 534).  "Apart from the text, the effect of a

20  law in its real operation is strong evidence of its object."

21  Church of Lukumi, 508 U.S. at 535.  Courts will not endorse a

22  law as neutral if, by design, the law works to target religious

23  conduct.  Id.  Plaintiffs contend the State and County order so

24  target in-person church services.  TRO at 10.  They argue that,

25  by proscribing faith-based gatherings and assemblies but

26  permitting "a host of comparable secular places where people

27  gather and assemble," the orders have fashioned a "religious

28  gerrymander" akin to the one struck down in Church of Lukumi,

15

1  508 U.S. 534.

2       But when Plaintiffs argue that church "is the only []

3  'essential service' on the state list that is required to limit

4  its core practice [] to electronic communication", Reply at 1,

5  they ignore that all comparable assemblies are completely

6  prohibited.  Grocery stores, liquor stores, and marijuana

7  dispensaries are not the proper point of comparison.

8  "[I]ndividuals enter [these stores] at various times to purchase

9  various items; they move around the store individually . . . and

10  they leave when they have achieved their purpose."  Maryville

11  Baptist Church, Inc. v. Beshear, No. 3:20-cv-278-DJH, 2020 WL

12  1909616, at *2 (W.D. Ky Apr. 18, 2020).  In-person church

13  services, on the other hand, are "by design a communal

14  experience, one for which a large group of individuals come

15  together at the same time in the same place for the same

16  purpose."  Id.  By Plaintiffs' own admission, they seek to

17  assemble, in part, for the sake of assembling.  Compl. ¶ 58

18  ("The Church has a sincerely and deeply held religious belief

19  that it is essential for them as Christians to assemble and

20  regularly gather together in person for the teaching of God's

21  Word, prayer, worship, baptism, communion, and fellowship.").

22  Consequently, "a more apt comparison . . . is a restaurant[,]

23  entertainment venue . . . movie, concert, or sporting event."

24  Id.  Like in-person church services, the State and County orders

25  temporarily prohibit all these activities.  State Opp'n at 14-

26  15; County Opp'n at 11-12.  The State and County orders are

27  neutral both on their face and in their application.

28       The Court also finds the orders are generally applicable.

16

1   "All laws are selective to some extent, but categories of
2   selection are of paramount concern when a law has the incidental
3   effect of burdening religious practice."  <u>Church of Lukumi</u>, 508
4   U.S. at 542.  Selectivity strips a law of its general
5   application when the law's restrictions "substantially
6   underinclude non-religiously motivated conduct that might
7   endanger the same governmental interest that the law is designed
8   to protect."  Stormans, 794 F.3d at 1079.  Courts suspect
9   impermissible animus toward religion when the government
10  interest advanced "is worthy of being pursued only against
11  conduct with a religious motivation."  <u>Church of Lukumi</u>, 508
12  U.S. at 542.

13      Plaintiffs claim "people are regularly gathering and
14  assembling at numerous commercial and transportation locations,"
15  and that the State and County orders "allow[] them to do so all
16  day long."  TRO at 11.  These gatherings, they argue, are non-
17  religiously motivated conduct that endangers the same
18  governmental interest the orders claim to protect.  <u>Id.</u>  But
19  courts only "compare the prohibited religious conduct with
20  <u>analogous</u> secular conduct when assessing underinclusivity."
21  <u>Gish</u>, 2020 WL 1979970, at *6 (citing <u>Stormans</u>, 794 F.3d at 1079)
22  (emphasis added).  And as previously explained, the type of
23  gathering that occurs at in-person religious services is much
24  more akin to conduct the orders prohibit—attending movies,
25  restaurants, concerts, and sporting events—than that which the
26  orders allow.

27      The orders are no less generally applicable because the
28  City of Lodi enforced them against Pastor Duncan.  Plaintiffs

1   have not produced any evidence that the City only enforced the
2   stay at home orders against religious entities.  <u>See</u> Local Opp'n
3   at 12-13.  Indeed, the City contends it issued Orders Precluding
4   Public Assembly "to any property owner in the County where the
5   County [had] knowledge that a gathering in violation of the
6   Public Health Orders likely took place."  Local Opp'n at 12.  On
7   the admittedly thin record before the Court, nothing supports a
8   finding that Lodi targeted the Church because of its religious
9   status rather than because it violated the law.  <u>See</u> Americans
10  United Amicus at 10.  The Court therefore finds the State and
11  County orders are generally applicable.

12      Being neutral laws of general applicability, the State and
13  County stay at home orders are only subject to rational basis
14  review.  <u>Church of Lukumi</u>, 508 U.S. at 543.  This standard
15  requires a law be "rationally related to a legitimate
16  governmental purpose."  <u>Stormans</u>, 794 F.3d at 1084.  "Plaintiffs
17  'have the burden to negat[e] every conceivable basis which might
18  support [the rules].'"  <u>Id.</u> (quoting <u>FCC v. Beach Commc'ns,
19  Inc.</u>, 508 U.S. 307, 315 (1993).  Plaintiffs did not meet that
20  burden here.  Accordingly, they are not likely to succeed on
21  their Free Exercise claim.

22      "The Free Exercise Clause commits government [] to
23  religious tolerance."  <u>Church of Lukumi</u>, 508 U.S. at 547.
24  "[E]ven slight suspicion that proposals for state intervention
25  stem from animosity to religion or distrust of its practices,
26  all officials must pause to remember their own high duty to the
27  Constitution and to the rights it secures."  <u>Church of Lukumi</u>,
28  508 U.S. at 547.  This Court has so paused.  But the incidental—

18

albeit uncomfortable—burden the State and County orders place on
the exercise of religion simply do not engender the type of
religious discrimination the Constitution aims to prevent. The
State and County orders are not unconstitutional. Rather they
are permissible exercises of emergency police powers especially
given the extraordinary public health emergency facing the
State.  Plaintiffs are not entitled to a temporary restraining
order enjoining the application of State and County orders
protecting the public health from a virulently infectious and
frequently deadly disease. Their challenge to these COVID-19-
related public health orders is therefore denied.

c.    Religious Land Use and Institutionalized
Persons Act (RLUIPA)

RLUIPA restricts state and local governments' ability to
"impose or implement land use regulation in a manner that
imposes a substantial burden on the religious exercise of a
person." 42 U.S.C. § 2000cc(a)(1).  If a land use regulation
imposes a "substantial burden," the government must show the
imposition of that burden is the least restrictive means of
furthering a compelling government interest.  42 U.S.C.
§ 2000cc(a)(1)(A),(B).  RLUIPA defines "land use regulation" as
"a zoning or landmarking law, or the application of such a law."
42 U.S.C. § 2000cc-5(5).  The State and County stay at home
orders regulate conduct, not land use.  See Exs. 5-6 to Compl.
Plaintiffs fail to identify any cases where a court has upheld a
challenge under this provision to a conduct-regulating statute.
Indeed, interpreting RLUIPA to regulate conduct in this way
would raise constitutional questions about the law's congruence

19

1  and proportionality.  See Guru Nanak Sikh Soc. Of Yuba City v.

2  County of Sutter, 456 F.3d 978, 986 (9th Cir. 2006) (citing

3  Cutter v. Wilkinson, 544 U.S. 709 (2005))("To avoid RFRA's fate,

4  Congress wrote that RLUIPA would apply only to regulations

5  regarding land use and prison conditions.")  Employing the canon

6  of constitutional avoidance, this Court finds RLUIPA, by its own

7  terms, does not apply to the State and County orders.

8  Plaintiffs are therefore unlikely to succeed on the merits of

9  this claim.

10           2.   Remaining Factors

11      A district court may not grant a plaintiff's motion for a

12  temporary restraining order if the request fails to show the

13  plaintiff is likely to succeed on the merits of a claim or, at

14  least, raises serious questions going to the merits of that

15  claim.  See Winter, 555 U.S. at 20; Alliance for Wild Rockies,

16  632 F.3d at 1135.  Plaintiffs here did not make either showing.

17  The Court need not consider the remaining factors in denying

18  their request.  Gish, 2020 WL 1979970, at *7.

19

20                       III.   ORDER

21      For the reasons set forth above, the Court DENIES Plaintiffs

22  ex parte application for a temporary restraining order.

23      IT IS SO ORDERED.

24  Dated: May 4, 2020

25

26  _____
    JOHN A. MENDEZ,
    UNITED STATES DISTRICT JUDGE

27

28